**Opinion issued December 5, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

—————————————

**NO. 01-23-00813-CR**

**NO. 01-23-00814-CR**

—————————————

**VICTOR DERICK DAROSA, II, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 239th District Court**
**Brazoria County, Texas**
**Trial Court Case Nos. 96045-CR and 96046-CR**

---

### MEMORANDUM OPINION

Appellant Victor Derick Darosa, II was indicted for aggravated robbery and evading arrest. A jury convicted him of both charges and assessed punishment of 27 years in prison for the aggravated robbery conviction, and 10 years for evading arrest. In two issues, Darosa argues (1) the evidence is insufficient to sustain his

conviction for aggravated robbery because the State failed to prove he was the person who robbed the complainant or that he used or exhibited a firearm during the robbery; and (2) the trial court erred in admitting evidence of extraneous offenses during the punishment phase of trial.

We affirm the trial court's judgment in Cause No. 96045-CR, and we affirm the trial court's judgment in Cause No. 96046-CR as modified.

## Background

On May 5, 2022, Blanca Escobedo stopped at a water kiosk in Alvin, Texas on her way home from work. When she got out of her Chevy Equinox car, a black truck pulled in next to her and a man wearing a black hoodie and dark jeans emerged, pulled the hood of his shirt over his head, and covered his face with a black mask. The man approached Escobedo and told her he was taking her car. The man got into the driver's seat of the Equinox. Escobedo could see a gun on the man's leg, sitting on his lap.

Escobedo asked the man for her phone and her brown Michael Kors handbag. After taking $39 from the wallet inside the purse, the man returned the wallet to Escobedo and put her cell phone on the ground, instructing her not to call the police right away. Authorities recovered Escobedo's Equinox nearby several hours later.

About one hour after Escobedo's car was stolen, authorities received a call concerning another carjacking involving a white Toyota Tacoma at an H-E-B parking lot water kiosk in Santa Fe, Texas. The incident also involved a black pickup truck. Soon after, authorities located the black pickup truck and the stolen Tacoma about a half mile away in a neighborhood. Both vehicles were parked on the side of the road. One man was loading wheels into the back of the black pickup truck, and another was standing nearby. The police arrested the man loading the wheels, but the second man, a Hispanic male wearing a dark-colored shirt and pants, ran into nearby woods. The search for the escaped suspect was called off after about two hours. When authorities searched the Tacoma, they found a black hoodie, a black mask,[1] and a silver .25 caliber pistol. Escobedo's key fob and a brown Michael Kors purse were found in the black truck.

Later that evening, authorities responded to another report involving a stolen red pickup truck in Santa Fe. Authorities located the red truck traveling on Highway 6, and after short pursuit, they cornered the truck on a dead-end street. The driver, who was barefoot and wearing a black shirt and blue jeans, ran off. Authorities searched for the man in the nearby area and about two hours later, they found and arrested Appellant Victor Derick Darosa, II. Darosa, who was hiding in a shed, was muddy and barefoot.

---

[1] DNA belonging to Darosa and an unknown individual was found on the mask.

Darosa was charged by indictment with two separate offenses. The first indictment, filed in Cause No. 96045-CR, alleges that on or about July 5, 2022, Darosa "did then and there intentionally flee from Scott Green, a peace officer, who was attempting lawfully to arrest or detain the defendant, and the defendant knew that Scott Green was a peace officer and was attempting to arrest or detain the defendant, and the defendant did then and there use a vehicle while the defendant was in flight[.]" *See* TEX. PENAL CODE §§ 38.04(a), (b)(2)(A). The second indictment, filed in Cause No. 96046-CR, alleges that on or about July 5, 2022, Darosa "did then and there while in the course of committing theft of property owned by Blanca Escobedo, and with intent to obtain or maintain control of said property, intentionally or knowingly threaten[ed] or place[d] Blanca Escobedo in fear of imminent bodily injury or death, and said defendant did use or exhibit a deadly weapon, namely a firearm[.]" *See* TEX. PENAL CODE §§ 29.03(a)(2); 1.07(a)(17)(A). Both charges were enhanced with a prior felony conviction for the offense of "unlawful possession of firearm by felon."

Darosa pleaded not guilty to each charge.

**Trial**

A. **Blanca Escobedo**

Blanca Escobedo testified that on July 5, 2022, she was on her way home from work in her Chevy Equinox and stopped at a water kiosk. She "turned

4

around and [] saw a black truck parked right next to where [she] was." She saw a tall, young slender Hispanic man emerge from the passenger side and "put his hoodie up . . . and then he put on a mask. And then I thought . . . he's going to do something to me." She testified the man walked toward her and "told me I don't want any problems . . . I'm going to take your vehicle." The man got into her Equinox and when he sat down in the driver's seat, Escobedo noticed a black handgun on the man's lap. She asked the man for her Michael Kors purse, which was on the passenger seat. The man took $39 from the wallet inside her purse and gave her the wallet. Escobedo asked for her cellphone and the man "picked it up and put it on the ground." The man told her not to call the police right away. When the man drove off in the Equinox, Escobedo's purse and key fob were still inside the car.

Escobedo called 911, and a police officer arrived.[2] Escobedo gave the officer her car's VIN number. Two to three hours later, the police found the Equinox and took Escobedo to her car located at a nearby parking lot. When Escobedo retrieved her car, the back license plate was missing. She could not identify Darosa in the courtroom as the person who took her car.

---

[2]     Candace Ivey is a dispatcher for the Alvin Police Department. She testified that she received a 911 call on July 5, 2022 at 4:49 p.m. from Blanca Escobedo. When Escobedo called, she "sounded upset. Definitely nervous. Somebody had just stolen her car."

5

### B. Amy Winebrenner

Officer Amy Winebrenner, an Alvin Police Department patrol officer, was the first officer on the scene. When she arrived, she spoke with Escobedo, who spoke broken English, but Officer Winebrenner was "able to get at least the basics" of what had transpired.[3] Escobedo gave her car's VIN number to Officer Winebrenner who then ran the number through dispatch to get the license plate, year, make, and model of Escobedo's car. After detectives arrived at the scene, they took over the investigation. Officer Winebrenner was able to locate Escobedo's Equinox by calling OnStar, which was linked to the car.

### C. Lyndsi Peppers

Lyndsi Peppers is a 911 dispatcher for the Santa Fe Police Department. She testified that on July 5, 2022, at 5:54 p.m., she received a 911 call about a stolen White Toyota Tacoma. Santa Fe Police officers searched for the Tacoma, which they eventually found together with a black pickup truck. The Alvin Police Department and Galveston County Sheriff's Office helped with the search. When they found the Tacoma, they arrested one man, but another man escaped.

### D. John Marvin Lamb, III

John Marvin Lamb, III is a loss prevention manager for H-E-B. He testified that on July 5, 2022, the Santa Fe Police Department asked him to review video

---

[3] Escobedo testified at trial through an interpreter.

6

footage from the parking lot of an H-E-B in Santa Fe. He testified that the video showed a black truck and a white truck leaving the parking lot.

**E.     Kenneth Bickerstaff**

Kenneth Bickerstaff is assistant chief of Santa Fe Fire and Rescue. He was en route to the fire station when a call went out about a car theft. The radio caller said that authorities were looking for a dark colored full size truck and a white Toyota Tacoma with a bed cover. Officer Bickerstaff saw two trucks that fit the description headed westbound on Highway 6 until they eventually "turned northbound onto Winwood and ten turned eastbound onto Westwood." He called Santa Fe dispatch and told them he "had eyes on the suspect vehicles." He continued to give Santa Fe dispatch directions on the suspects' way of travel," until the trucks turned onto Windwood Road. At that point, he pulled over on Highway 6 and "waited for Santa Fe P.D." Marked police cars showed up minutes later and they located the black truck and the Tacoma pulled over on the edge of Westwood. Corporal Brian Tandy arrested the driver of the black truck, but the driver of the Tacoma, who Officer Bickerstaff described as a man with "bushy hair," ran away. Officers from several law enforcement agencies arrived to help Officer Bickerstaff search for the second man, but the search was called off about an hour and a half later.

### F.    Brian Tandy

Corporal Brian Tandy is a Santa Fe police officer.  On July 5, 2022, he was dispatched to a carjacking scene.  He testified that the complainant was at the Santa Fe H-E-B and the stolen vehicle was a white Toyota Tacoma.  Corporal Tandy received an update that the Tacoma and a dark-colored pickup truck had been spotted on Highway 6.  Corporal Tandy started traveling on Highway 6 and then turned north on Windwood Road, where Officer Bickerstaff indicated the trucks had turned.  He "went down Windwood" and then "turn[ed] . . onto Westwood" where he found the black truck and the Tacoma parked on the side of the road.  One male was loading wheels into the black truck.  Officers took that man, Alberto Curiel, into custody, but another male escaped into nearby woods.  The male "looked like he was wearing dark clothing with dark hair."  Officers searched for the male without success for about an hour and a half.

When authorities searched the black truck, they found a Michael Kors purse, Escobedo's key fob, and a silver gun.

### G.    Elena Colon

Officer Elena Colon worked for the Santa Fe Police Department on July 5, 2022.  Soon after going on duty at 6 p.m., she was advised that a carjacking had occurred at the parking lot of H-E-B parking lot in Santa Fe.  She left the police station and started traveling on Highway 6 toward Alvin, Texas.  She was looking

8

for "an older model white truck" and "an older model black pickup truck." She eventually turned northbound on Windwood where she and Corporal Tandy found the trucks. She saw two males. Curiel was standing on the left side of the black truck and was taken into custody. A second male, who was standing on the right side of the black truck, ran away. The man that fled was wearing a dark-colored shirt, dark pants, sandals or flip-flops, and he had short curly hair. According to Officer Colon, the man appeared to be Hispanic.

Officer Colon went into the woods to look for the fleeing suspect. She saw the side of the escaping suspect's face. She was approximately 50 to 100 feet away when she saw him. Law enforcement personnel searched for the suspect unsuccessfully for about an hour and a half. Deputy Colon testified that she found shoes or sandals as she walked through the wooded area in pursuit of the suspect.

Later that evening, at around 9:21 p.m., Officer Colon received another call reporting a stolen red pickup truck in Alvin, Texas. Several law enforcement agencies responded. By the time Officer Colon arrived at the scene, she saw Darosa, who had been arrested. She identified photos of Darosa taken during his arrest, and she testified that he was the same person she had chased in the woods earlier that day. She said the photos reflected that Darosa was barefoot when he was arrested.

Officer Colon identified a purse found in the black truck as a Michael Kors purse.

**H.     Glenn Womack**

Glenn Womack is a truck driver.  He testified that on July 5, 2022, he was unloading his pickup truck and putting items into his tractor trailer for work the next morning.  At approximately 9:21 p.m., someone drove off in his red pickup truck.  He did not see the person who stole his truck.  Womack and a friend followed the red truck.  Womack called 911, told them where he was, and stayed on the line with dispatch until he saw police lights.  A short pursuit ensued. Authorities recovered the red pickup truck and later released it to Womack.

**I.     Scott Green**

On July 5, 2022, at around 5 p.m., Alvin Police Officer Scott Green, a canine officer, was investigating a car theft on Mustang Road, when he was dispatched to another call involving a Santa Fe police pursuit near Windwood Road.  A man had been taken into custody, but another male had fled on foot and "disappeared in the wood line."  When Officer Green arrived at the scene, he and his dog began to search the nearby woods for the escaped suspect.  They searched for about two hours before abandoning the search.

That same day, at around 9:21 p.m., Officer Green was dispatched to another scene regarding a stolen red truck.  The stolen truck car was "headed towards

10

Alvin from Santa Fe being followed by the owner of the car." Officer Green saw the stolen truck coming towards him at a distance. He activated his lights and started following the truck. The chase ended in a cul de sac. The truck came to a stop and the driver jumped out and fled.

Several law enforcement agencies helped search for the suspect. At around 10:40 p.m. that night, Officer Green found and arrested Darosa, who was hiding in a shed about a hundred yards from the red truck. He was wearing pants that "had a lot of mud on them" and a black shirt over a "white shirt that was dirty." Darosa did not resist arrest. No weapon was recovered in the shed or the red pickup truck.

## J.    Cody Myers

Santa Fe Police Detective Cody Myers was called to an aggravated robbery scene on July 5, 2022 at around 6 p.m. When he arrived at the scene, he saw a black pickup truck and a white Tacoma on the side of the road. He took pictures and collected evidence at the scene. The back license plate on the black truck was different from the front license plate. A purse, Escobedo's car key fob, and a polished nickel or chrome handgun were recovered from the black truck. He recovered a black hoodie and a black mask from the front passenger seat of the white Tacoma. He took DNA swabs from both trucks.

11

## K. Edward Pean

Corporal Edward Pean, a detective with the Santa Fe Police department, testified he was dispatched to a carjacking scene at an H-E-B on July 5, 2022 at around 6 p.m. He never made it to the scene because he heard on the radio that while one suspect had been arrested, a second suspect had fled. He helped search for the escaped suspect, but after about two hours, the search was called off.

Corporal Pean helped the other officers at the crime scene. He took DNA samples, a mask, and a hoodie, which had been collected from the white Tacoma to the crime lab. A silver gun was also recovered. Authorities looked for a black gun but did not find one.[4]

Later that same night, at around 9:21 p.m., Corporal Pean heard about another stolen car[5] in Santa Fe. The car was stolen in the "same area [] where the suspect had fled."

## L. Andrea Ormos

Andrea Ormos is a forensic scientist with the Texas Department of Public Safety Crime Lab. She performed a DNA analysis on the recovered black hoodie, the black mask, and a firearm magazine. She was unable to obtain a DNA profile from the hoodie or the magazine, but the DNA obtained from the mask was "a

---

[4]    Corporal Pean testified that "a week or so" later, a black gun was recovered, but it is not clear whether the gun was involved in the carjackings.

[5]    Although he referred to the vehicle as a car, he was referring to the stolen red pickup truck.

12

mixture of two individuals," one of whom was likely Darosa.[6] Curiel's DNA was not found on any of the items.

## M. Lauren Barkdull

Detective Lauren Barkdull works for the Alvin Police Department. She was dispatched to a crime scene on May 5, 2022 between 5 p.m. and 6 p.m. When she arrived at the scene, she spoke with Officer Winebrenner and Escobedo, who spoke broken English. A Spanish-speaking officer translated during Detective Barkdull's interview of Escobedo. According to Detective Barkdull, Escobedo "described a male that was approximately 6 feet tall wearing a black-hooded sweatshirt with the hoodie pulled down over his eyes and a black cloth mask. The only thing that she could see was his hands. And she believed looking at his hands that he was Hispanic."

While Officer Winebrenner was talking to Escobedo, Detective Barkdull learned the stolen Equinox was about a mile away and she and Escobedo went to the parking lot where the car was recovered. About an hour later, Detective Barkdull learned about another carjacking at a water kiosk involving a white Tacoma. The incident also involved a black pickup truck. And later that evening, Detective Barkdull heard about a third stolen vehicle.

---

[6] Ormos testified that the "probability of obtaining this mixture profile if the DNA came from Victor Darosa and one unrelated, unknown individual is 70.4 septillion times greater than the probability of obtaining the profile if the DNA came from two unrelated, unknown individuals."

13

The defense did not call any witnesses during the guilt-innocence phase. After the close of evidence and closing statements, the jury convicted Darosa of aggravated robbery and evading arrest.

## Punishment

During the punishment phase of trial, Darosa pleaded "not true" to two enhancements for the felony offense of unlawful possession of a firearm by a felon. The State called one witness and the defense called three witnesses, including Darosa.

The State's witness, Investigator Matthew Boswell of the Brazoria County Sheriff's Department, testified that Darosa's fingerprints matched the fingerprints on the judgments for unlawful possession of a firearm by a felon, unauthorized use of a motor vehicle, and driving while intoxicated.

The defense witnesses were Dominique Thomas, the mother of four of Darosa's children; Darosa's sister, Erica; and Darosa. Thomas and Erica Darosa testified that Darosa, who has six children, is a good parent. And Darosa testified that he is very involved with his children. He conceded that he had two pending charges involving the alleged assaults he committed against two of his teenaged daughters.

Darosa acknowledged that when he drove to the water kiosk where he encountered Escobedo, he was wearing a black hoodie and a black mask. He and

14

Curiel chose the water kiosk so they "didn't have to involve any people." He testified he took two Xanax that day and consequently did not remember the events of that day, except that a police dog bit him. He testified about his prior convictions and incarcerations.

The jury assessed punishment at 10 years in prison for evading arrest and 27 years for aggravated robbery. The sentences are to run concurrently.

This appeal ensued.

## Sufficiency of the Evidence

In his first issue, Darosa argues that the evidence is insufficient to support his conviction for aggravated robbery because (1) there was insufficient evidence identifying him as the man who robbed Escobedo, and (2) the State did not prove that a deadly weapon was used or exhibited when Escobedo's car was stolen.

### A.      Standard of Review

We apply the legal sufficiency standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979) to determine whether the evidence is sufficient to support each element of a criminal offense the state must prove beyond a reasonable doubt. *See Brooks v. State*, 323 S.W.3d 893, 895, 901 (Tex. Crim. App. 2010) ("[A] legal-sufficiency standard [is] 'indistinguishable' from a factual-sufficiency standard[.]"); *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (noting *Brooks* "abolished factual-sufficiency review as it applies to criminal

convictions"); *see also Malbrough v. State*, 612 S.W.3d 537, 568 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (Countiss, J., concurring) ("[A]fter *Brooks*, we decided to apply the legal sufficiency standard of review to questions of fact, viewing the evidence in the light most favorable to the jury's verdict, rather than neutrally reweighing it.").

Evidence is legally sufficient if "any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023) (citation omitted). In conducting our legal sufficiency review, we consider the evidence in the light most favorable to the verdict without reweighing the evidence, substituting our judgment for that of the jury, or acting as a thirteenth juror. *Id.*; *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (stating courts must "not [] become a thirteenth juror" and "not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder") (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *McPherson,* 677 S.W.3d at 664 (quoting *Jackson*, 443 U.S. at 319). The jury is the "sole judge of the credibility and weight" to be given to witnesses' testimony. *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App.

16

2023); *Mottin v. State*, 634 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) ("The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all the evidence or testimony proffered, and weigh the evidence as it sees fit."). When the record supports conflicting inferences, we presume that the jury resolved conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326. Our role in this review is to act as a "due process safeguard," requiring us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the offense of which he is accused. *Malbrough*, 612 S.W.3d at 559 (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)).

We may consider both direct and circumstantial evidence in our legal sufficiency analysis, as well as any reasonable inferences that may be drawn from the evidence. *Id.* "[C]ircumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Evidence may be sufficient to sustain a conviction even if the State does not "disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt." *Malbrough*, 612 S.W.3d at 559; *see also Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016) ("[T]he State's burden does not require it to disprove every conceivable alternative to a defendant's guilt."). "Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based upon the

cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

## B. Evidence of Identity

Darosa argues the evidence was insufficient to support his conviction for aggravated robbery because there was insufficient evidence identifying him as the man who robbed Escobedo.

"Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)). Identity may be proven by a single witness' testimony. *Gibbs v. State*, 555 S.W.3d 718, 728 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Eyewitness identification, however, is not necessary to establish a defendant committed a crime. *Gardner*, 306 S.W.3d at 285–86 (holding evidence sufficient to support conviction despite lack of eyewitness testimony); *Greene v. State*, 124 S.W.3d 789, 792 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (recognizing eyewitness identification not necessary to identify defendant as perpetrator). Identity may be proven by inference.[7] *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd); *see Turner v. State*, No. 01-21-00569-CR,

---

[7] "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014) (quoting *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) (alteration in original).

2023 WL 3510911, at *5 (Tex. App.—Houston [1st Dist.] May 18, 2023, pet. ref'd) (mem. op., not designation for publication) (holding jury could have reasonably inferred complainant failed to identify defendant not because defendant was not assailant but because "it was dark and it happened so quickly" and complainant was "focused on the firearms that the assailants were pointing at him and not focused on their faces").

Darosa first argues that Escobedo's inability to identify him in court as the robber is fatal to the State's case. We disagree. "The absence of an in-court identification does not render the evidence insufficient if the State offers other evidence sufficient to identify the defendant as the perpetrator." *Rocha v. State*, No. 01-22-00109-CR, 2023 WL 2696691, at *3 (Tex. App.—Houston [1st Dist.] Mar. 30, 2023, pet. ref'd) (mem. op., not designated for publication); *Adams v. State*, 418 S.W.3d 803, 810 (Tex. App.—Texarkana 2013, pet. ref'd) ("The lack of a formal, in-court identification does not necessarily render the evidence insufficient to establish identity."); *Zavala v. State*, No. 08-22-00035-CR, 2023 WL 1071661, at *2 (Tex. App.—El Paso Jan. 27, 2023, no pet.) (mem. op., not designated for publication) ("[T]he absence of a victim's in-court identification does not render the evidence on the issue of identity legally insufficient."); *Carter v. State*, No. 14-15-00051-CR, No. 14-15-00052-CR, 2016 WL 1578836, at *2 (Tex. App.—Houston [14th Dist.] Apr. 19, 2016, pet. ref'd) (mem. op., not

19

designated for publication) ("The lack of an eyewitness identification is not dispositive, especially because it is undisputed that all four robbers wore masks.").

Although Escobedo could not identify Darosa in court, other evidence supports Darosa's identification as the man who robbed Escobedo. Escobedo described the man who stole her car as a tall man "wearing a black-hooded sweatshirt with the hoodie pulled down over his eyes and a black cloth mask." On the same day Escobedo's car was stolen, a man wearing a dark-colored shirt, dark pants, and flip flops fled from authorities when they found him near a stolen white Tacoma. And that evening, authorities chased a man in a stolen red truck, who fled on foot a second time. The man was barefoot and wearing a black shirt and blue jeans. The man turned out to be Darosa, who was hiding in a shed, muddy and barefoot. "[A] factfinder may draw an inference of guilt from the circumstance of flight." *Clayton*, 235 S.W.3d at 780; *see also Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt."); *Sosa v. State*, 177 S.W.3d 227, 230 (Tex. App.—Houston [1st Dist. 2005, no pet.) ("[E]vidence of flight from a crime scene is a circumstance from which an inference of guilt may be drawn.").

Even further, when authorities first located the stolen white Tacoma, they also located a black pickup truck. Escobedo testified that the male who stole her Equinox had emerged from a black truck. When authorities found the Tacoma and

20

the black truck, they searched both trucks. They found a black hoodie and a black mask in the front passenger seat of the Tacoma, and they found a purse matching the description of Escobedo's purse and her key fob inside the black pickup truck. It is "well settled" that a defendant's unexplained possession of recently stolen property "permits an inference that the defendant is the one who committed the burglary." *Rollerson v. State*, 227 S.W.3d 718, 725 (Tex. Crim. App. 2007) (citing *Poncio v. State*, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006)).

Darosa next argues that Officer Colon's identification of him as the man she chased is not credible because she only saw the side of the face of the man she was chasing at a distance of 50 to 100 feet away. The State responds that this argument involves a credibility determination and the jury "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). We agree. "[I]t is the prerogative of the trier of fact, after receiving testimony of how a witness makes an identification, to decide the weight to give this testimony." *Sandifer v. State*, No. 05-91-00548-CR, 1992 WL 76520, at *2 (Tex. App.—Dallas Apr. 9, 1992, pet. ref'd) (not designated for publication).

Darosa also argues that because his DNA, along with that of someone else was found on the mask, the evidence indicates that someone else could have robbed Escobedo. But the mere existence of alternative theories separate from

21

those advanced by the State does not render evidence insufficient. *See Williams v. State*, No. 2-06-199-CR, 2007 WL 2330991, at *4 (Tex. App.—Fort Worth Aug. 16, 2007, no pet.) (mem. op., not designated for publication) (holding jury was free to disregard appellant's theory as to how his DNA ended up on evidence collected from crime scene, noting appellate court "may not simply substitute [its] judgment for the jury's"); *see also Williams v. State*, 196 S.W.3d 365, 369 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (affirming robbery conviction on sufficiency challenge where there was evidence available to support jury's finding, but no DNA or fingerprint evidence, no witnesses other than complainant, no line-up, and where darkness at time of robbery likely limited complainant's visibility); *Harmon v. State*, 167 S.W.3d 610, 614 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) ("A rational jury could have found appellant guilty of aggravated robbery without DNA evidence, fingerprint evidence, or evidence of the gun or cash [the complainant] gave to appellant.").

The remainder of Darosa's argument comprises two sentences: "Officer Green testified that he did not locate a gun on Appellant or in the shed where Appellant was arrested," and "Corporal Pean testified that the black pickup truck found at the Santa Fe crime scene was registered to the mother of Alberto Curiel who was arrested at the Santa Fe crime scene." Darosa does not connect the dots or otherwise explain why this undercuts the evidence pointing to his involvement

22

in the robbery. Even if the gun Escobedo described was not recovered, "[t]he lack of physical or forensic evidence . . . does not render the evidence insufficient; the lack of such evidence is simply a factor for the jury to consider in weighing all the evidence." *Hopkins v. State*, No. 05-14-00146-CR, 2015 WL 3413582, at *3 (Tex. App.—Dallas May 28, 2015) (mem. op., not designated for publication), *aff'd on other grounds*, 487 S.W.3d 583 (Tex. Crim. App. 2016); *Walker v. State*, No. 05-22-01119-CR, 2024 WL 1298096, at *5 (Tex. App.—Dallas Mar. 27, 2024, pet. ref'd) (mem. op., not designated for publication) ("[T]he fact that the State did not recover the murder weapon and had little in the way of DNA evidence is not dispositive of the issue of whether the evidence is sufficient to support appellant's conviction."). Nor are we persuaded by the fact the black pickup truck was not registered to Darosa. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The jury had the opportunity to assess the credibility of Escobedo, Officer Colon, and all other witnesses and to make reasonable inferences from their testimony. *See Limon v. State*, No. 01-22-00022-CR, 2023 WL 4872916, at *6 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.) (mem. op., not designated for publication) ("In reviewing historical facts that support conflicting inferences,

23

we must presume that the jury resolved any such conflicts in the State's favor, and we must defer to that resolution.").

The evidence established that a man who emerged from a black pickup truck wearing a black hoodie and dark jeans and donning a black mask robbed Escobedo. The black truck was discovered a short time later with a white stolen truck that contained a black hoodie and a black mask containing Darosa's DNA. Escobedo's purse and key fob were recovered from the black truck. A man wearing a dark-colored shirt, dark pants, and flip flops fled from authorities when they found him near the stolen white Tacoma and black truck. And that evening, authorities chased a man in a stolen red truck, who fled on foot a second time. The man was barefoot and wearing a black shirt and blue jeans. The man turned out to be Darosa, who was hiding in a shed, muddy and barefoot.

Considering all the evidence in the light most favorable to the verdict, we conclude the jury was rationally justified in determining Darosa was the individual who robbed Escobedo.

## 2. Deadly Weapon Finding

Darosa next argues there is insufficient evidence supporting his conviction for aggravated robbery because the State did not prove that the man who stole Escobedo's car used or exhibited a deadly weapon during the robbery.

A person commits robbery if, in the course of committing theft, he "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX. PENAL CODE § 29.02(a)(2). A person commits aggravated robbery if he commits robbery and "uses or exhibits a deadly weapon." *Id.* § 29.03(a)(2). A "deadly weapon" is a "firearm, or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury" or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(a)(17).

To sustain a deadly weapon finding, the evidence must demonstrate that (1) the object meets the statutory definition of a deadly weapon, (2) the deadly weapon was used or exhibited during the transaction from which the felony conviction was obtained, and (3) other people were put in actual danger. *Mayes v. State*, 536 S.W.3d 102, 109 (Tex. App.—Amarillo 2017, pet. ref'd) (citing *Brister v. State*, 449 S.W.3d 490, 494 (Tex. Crim. App. 2014)); *Brister*, 449 S.W.3d at 494 (stating "actual danger" refers to risk of "death or serious bodily injury"). Mere possession of a deadly weapon during the commission of a felony offense is not sufficient to establish a deadly weapon finding. *See Plummer v. State*, 410 S.W.3d 855, 864 (Tex. Crim. App. 2013). Rather, the evidence must establish some "facilitation connection" between the weapon and the felony offense. *Id*. at 865.

Escobedo testified that when the man who stole her car got into the driver's seat, she noticed a handgun on the man's lap. A gun is a deadly weapon *per se*. *Williams v. State*, 567 S.W.2d 507, 509 (Tex. Crim. App. 1978). Darosa argues "the robber did not use or exhibit the gun in the commission of this crime if the gun was lying on the robber's lap as he made his getaway from the crime scene." In support of his argument, he relies on a single sentence from *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000), arguing that mere possession of a deadly weapon is not tantamount to the "use or exhibit" requirement of Section 29.03(a)(2) of the Penal Code. Darosa states, "The fact that a gun may have been resting on the robber's lap as he graciously returned [Escobedo's] wallet and then fled the scene is not sufficient evidence that he used or exhibited a gun to facilitate the crime of stealing Escobedo's car."

The State argues that a deadly weapon is "used" during the commission of a crime if it is employed or utilized to achieve its purpose. It further argues that a deadly weapon is "exhibited" if it is "consciously displayed during the commission of the required felony offense." *See Boston v State*, 373 S.W.3d 832, 838 (Tex. App.—Austin 2012), *aff'd*, 410 S.W.3d 321 (Tex. Crim. App. 2013) (citing *Patterson v. State*, 769 S.W.2d 938, 940–41 (Tex. Crim. App. 1989)). The State contends that sufficient evidence supports the aggravated element of using or

exhibiting a deadly weapon because Escobedo "saw a pistol lying on the suspect's leg near his waist and she was afraid."

To determine whether a weapon was "used" to commit a felony, the evidence must establish the weapon furthered the commission of the crime or "enabled, continued, or enhanced the offense." *Mayes*, 536 S.W.3d at 109. The term "use of a deadly weapon" not "only includes the wielding of a firearm, but also extends 'to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony.'" *Robinson v. State*, 174 S.W.3d 320, 332 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (quoting *Patterson*, 769 S.W.2d at 940–41 (emphasis in original)). A deadly weapon is "exhibited" if it was "consciously shown or displayed during the commission of the offense." *Plummer*, 410 S.W.3d at 858 (citing *Patterson*, 769 S.W.2d at 941).

While a person "can 'use' a deadly weapon without exhibiting it, [ ] it is doubtful one can exhibit a deadly weapon during the commission of a felony without using it." *Id.* Proximity is a factor courts consider when determining whether a deadly weapon is "used or exhibited" during the commission of a felony. *Mayes*, 536 S.W.3d at 109. "The law does not require that the actor commit an overt gesture with the weapon; the mere carrying of a weapon during a robbery can be legally sufficient evidence for a jury to conclude that the intended use of the

weapon was that it be capable of causing death or serious bodily injury." *Boston*, 373 S.W.3d at 838.

We agree with the State that the evidence is legally sufficient to support the jury's deadly weapon finding. The opinion in *McCain*, on which Darosa relies, supports this conclusion. In *McCain*, the defendant burst into the complainant's house, struck her several times with his fist, and stole her car and pager. 22 S.W.3d at 499. The complainant testified that during the assault, she saw an object that appeared to be a knife sticking out of the defendant's back pocket, and the defendant had a butcher knife in his pocket when he was arrested. *Id.* The evidence did not indicate the defendant had "touched, brandished, referred to, or overtly displayed the knife in any way other than having it partly sticking out of his pocket." *Id.* The Court of Criminal Appeals held that the defendant, who had not verbally threatened the complainant, brandished the knife, or referred to the knife during the assault, had nevertheless "used or exhibited" the knife when he assaulted the complainant. *Id.* at 503. The court explained:

> Had the knife been completely concealed by appellant's clothing, additional facts would have been needed to establish that the butcher knife was used. But the knife was partially exposed, and from that exposure, the factfinder could rationally conclude that the knife was exhibited during the criminal transaction, or at least, that its presence was used by appellant to instill in the complainant apprehension, reducing the likelihood of resistance during the encounter.

*Id.* at 503. The court did not equate mere possession of the knife with "use or exhibit" under Section 29.03(a)(2). *Id.* Rather, it held the determining factor was "that the deadly weapon was 'used' *in facilitating* the underlying crime." *Id.* (emphasis in original); *see also Patterson*, 769 S.W.2d at 939 (holding deadly weapon was used where officers executing warrant for drug possession entered home and found defendant sitting on sofa, gun located between defendant's leg and end of sofa, and "gun boot" on end table next to defendant); *Castillo v. State*, 426 S.W.3d 135, 138–39 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding evidence was sufficient to support jury's deadly weapon finding where loaded semi-automatic rifle and shotgun were found in plain view leaning against wall near drugs in room where defendant was sleeping).

Escobedo testified that she saw the gun in plain sight on the robber's lap and she was scared. She was in close proximity to the car and the man with the gun. She testified that while the robber was in her car, with the gun on his lap, he took the wallet from her purse and after removing the cash from the wallet, he handed the wallet to her and put her cell phone on the floor instructing her not to call the police immediately. Like the court in *McCain*, we hold that even though the robber did not threaten Escobedo, brandish the gun, or refer to the gun during the robbery, a jury rationally could have concluded that the gun, which was in plain view, was exhibited during the robbery or that its presence was used by Darosa to

29

instill in Escobedo apprehension, reducing the likelihood of resistance during the encounter. *Robinson*, 174 S.W.3d at 332 (stating use of deadly weapon includes "*any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated felony") (emphasis in original). Viewing the evidence in the light most favorable to the verdict, as we must, we hold a rational trier of fact could have determined Darosa used or exhibited a deadly weapon during commission of the robbery.

We overrule Darosa's first issue.

## Evidence of Extraneous Offenses

In his second issue, Darosa argues the trial court abused its discretion by allowing the State to introduce evidence during the punishment phase of trial about Darosa's two pending felony charges for injury to a child involving two of his children. The State sought to admit the evidence because it contended Darosa's testimony and that of his two other witnesses had left a false impression with the jury that Darosa was a good father. Darosa testified as follows:

Defense: Tell us about your children. What do you do for your children?

Darosa: I bring them to school, pick them up from school. I bring them to their – there's so many of them that – well, when she's bringing one to Angleton and the other have practice in Lake Jackson that we have to split up. Sometimes we as parents can't even be together at a lot of the games. We have to go our separate ways because one child is playing in a[n] out of city game and one will

30

> be at home.  On holidays we're always together up until this year.
>
> . . .
>
> Darosa:     My other kids' mom passed away.  I have two mothers of my child.  One had passed away.  I had my two daughters for six years now, seven years, since – they've been in my custody.  And I've been full-time dad to them.  My mom's helped me out a lot with them.

Dominique Thomas, the mother of four of Darosa's six children, testified that Darosa was a good father:

> Defense:    And how is he as a father?
>
> Thomas:     He's a good father.  Like he shows up for the kids.  Our kids play sports year round and they're involved in a lot of like other programs at school. He's always shown up whenever he can.
>
> Defense:    Has he participated as a coach or anything else like that?
>
> Thomas:     Yes.  Our oldest daughter, he used to coach her softball team.
>
> Defense:    Okay.  So, he's pretty involved with his children.  Is that fair to say?
>
> Thomas:     Correct.

Finally, Erica Darosa testified that her brother is a good parent:

> Defense:    How is he with his children?
>
> E. Darosa:  He's really good with them.  Anything they need, he's there for them.  He would always go to all their games, anything that they had 'cause they're very active, and bring them to school, pick them up.  Like, I mean, we

31

> always had holidays together like – because of him, we grew up family.

Defense: So, he kind of assumed a father figure. Is that fair to say?

E. Darosa: Yes.

Evidence of Darosa's pending felony charges for injury to a child involving two of his children was admitted as rebuttal evidence after the following exchange:

The State: [B]oth . . . Dominique, his child's mother, and Erica, his sister, as well as this defendant have testified that he's a good father, he'd do anything for his children. He's a dutiful father. And I've gone down that road and I actually asked Erica that – is he – you're saying he's good to all his children and she said yes.

The problem I have, Judge, is that that's a false impression because Mr. Darosa and his mother Karen are both charged with injury to a child in this court that's currently pending for beating up and assaulting . . . his two daughters. That happened back on May the 3rd of 2022.

So, I'm not trying to get into trying that case. However, I think I'm allowed to correct the misimpression.

The Court: Under [Texas Rule of Evidence] 609?

The State: Well, it's not 609 but it's – it's allowed – I think I'm allowed to correct the misimpression that he's a good father because he's currently charged with injuring two of his children. And I understand they're just allegations but I believe that the defendant and his sister and his child's mother have put forward a false impression to this jury that I have the right to rebut.

Defense: Of course, my objection would be it'd be highly prejudicial, Your Honor, to go into that. We've already

finished the punishment – guilt/innocence and they go into punishment about another crime that he has pending would be highly prejudicial, I think, to my client.

The Court: Okay. Let me just take a look real quick. I thought it was either [Rule] 608(b) or 609 dealing with character.

The State: It may be 608. 609 would be impeaching with a prior.

The Court: 608(b), once character is brought into question[8] – all right. I'm going to – I'm going to allow it. It's admissible. So, yeah.

Darosa argues he did not open the door to admissibility of his pending felony charges because while his girlfriend, Thomas, testified he was a good father, he never made such a claim and thus he did not leave a false impression with the jury. The State responds that Darosa waived this argument, and, in any event, the admission of the evidence was not erroneous.

## A. Standard of Review

We review a trial court's ruling on the admission of evidence for abuse of discretion. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). This standard of review applies to a trial court's decision to admit evidence of

---

[8]     Texas Rule of Evidence 608, entitled "A Witness's Character for Truthfulness or Untruthfulness," states:

> Specific Instances of Conduct. Except for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness.

TEX. R. EVID. 608(b).

33

extraneous offenses. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.*

An extraneous offense is "any act of misconduct, whether resulting in prosecution or not, which is not shown in the charging instrument and which was shown to have been committed by the accused." *Martinez v. State*, 190 S.W.3d 254, 262 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (quoting *Worley v. State*, 870 S.W.2d 620, 622 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd)). Because an accused must be tried only for the offense for which he is charged and may not be tried for a collateral crime, extraneous offense evidence of "a person's character or character trait" is usually not admissible to "to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a)(1). But evidence "that is otherwise inadmissible may become admissible when a party opens the door to such evidence." *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) (citing *Renteria v. State*, 206 S.W.3d 689, 697–98 (Tex. Crim. App. 2006)). By leaving a false impression with the jury, a party opens the door to the admission of extraneous offenses and invites the other side to respond. *Id.* (citing *Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005)). During the punishment phase, "extraneous unadjudicated offenses

34

may be admissible if the accused opens the door to the admission of such evidence." *Beasley v. State*, 838 S.W.2d 695, 706–07 (Tex. App.—Dallas 1992, pet. ref'd).

## B.    Analysis

We need not determine whether the trial court erred in admitting evidence regarding Darosa's pending felony charges for injury to a child because Darosa waived his Rule 403 argument on appeal by failing to provide a harm analysis, and he further failed to preserve the Article 37.07 argument he now advances on appeal.

### 1.    Texas Rule of Evidence 403

Darosa objected in the trial court that evidence regarding the extraneous offenses would be "highly prejudicial."  Darosa's objection ostensibly was based on Texas Rule of Evidence 403. Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403.

Even were we to conclude the trial court erred in admitting the extraneous offense evidence under Rule 403, as with other alleged evidentiary errors, we cannot reverse a trial court's evidentiary ruling unless Darosa establishes the trial court's error resulted in harm.  The erroneous admission of evidence constitutes

non-constitutional error subject to a harm analysis. *See* TEX. R. APP. P. 44.2 (setting forth standards for constitutional and non-constitutional harm); *see also Paroline v. State*, 532 S.W.3d 491, 502 (Tex. App.—Texarkana 2017, no pet.) ("If the trial court errs in admitting extraneous-offense evidence in the punishment phase, it is non-constitutional error."); *Portis v. State*, No. 10-15-00152-CR, 2016 WL 7478030, at *3 (Tex. App.—Waco Dec. 28, 2016, no pet.) (mem. op., not designated for publication) (assuming without deciding complained-of testimony was erroneously admitted during punishment phase and addressing whether defendant was harmed by admission of evidence); *Roethel v. State*, 80 S.W.3d 276, 281–83 (Tex. App.—Austin 2002, no pet.) (considering whether trial court's admission of extraneous offense evidence during punishment phase of trial was harmful). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Schultze v. State*, 177 S.W.3d 26, 39 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

To assert an issue on appeal, an appellant's brief must contain a "clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). A harm analysis should include argument, explanation, substantive analysis, and citation to authorities to show why the appellant was harmed by the trial court's purportedly erroneous admission of extraneous offenses. *See Adell v. State*, No. 01-21-00439-CR, 2023 WL 4938111, at *43 (Tex. App.—Houston [1st Dist.] Aug. 3, 2023, pet. ref'd) (mem. op., not designated for publication).

To the extent Darosa provided a harm analysis, he did so in a sole paragraph stating:

> Appellant contends that the trial court erred in allowing the State to cross-examine him about the unadjudicated felony charges because allowing testimony about felony charges that were not proven beyond a reasonable doubt was purely inflammatory and intended to mislead the jury in assessing a disproportionate sentence to the crime for which he was convicted. The specter of uncharged Injury To A Child allegations was highly prejudicial to Appellant and was so harmful and influential to the jury that it affected a substantial right to a fair trial and directly contributed to the conviction of Aggravated Robbery under Tex. Rule of App. Proc. 44.2 when he never opened the door to the admission of this unproven evidence with his own testimony.

The conclusory statement that evidence of the extraneous offenses "was highly prejudicial to Appellant and was so harmful and influential to the jury that it affected a substantial right to a fair trial and directly contributed to the conviction of Aggravated Robbery" is not a proper harm analysis. Darosa does not identify

37

the harm that resulted from admission of the challenged evidence during the punishment phase of trial. Nor does his brief contain any substantive analysis, explanation, or citation to authorities to show how he was harmed by the trial court's alleged error in admitting the extraneous offense evidence.

We thus hold Darosa waived his complaint on appeal that the trial court erred in admitting evidence of the extraneous offenses during the punishment phase of trial under Rule 403. *See Adell*, 2023 WL 4938111, at \*43 (holding appellant waived complaint on appeal regarding admission of testimony because brief contained "no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purportedly erroneous admission of the complained-of . . . testimony"); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Chaves v. State*, 630 S.W.3d 541, 557–58 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding appellant waived complaint that trial court erred in admitting certain evidence because his brief "contain[ed] no argument, explanation, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the State's [evidence]"); *Wilson v. State*, 473 S.W.3d 889, 900–01 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (holding defendant waived complaint that trial court erred

38

in admitting certain evidence where he failed to "identify[ ] the harm that he suffered as a result of the admission of the complained-of evidence").

## 2. Article 37.07 of the Texas Code of Criminal Procedure

Darosa also argues on appeal that evidence of the extraneous offenses was inadmissible under Article 37.07, Section 3(a)(1) of the Texas Code of Criminal Procedure because the State did not prove the offenses beyond a reasonable doubt. The State argues that Darosa failed to preserve this argument because he never raised it below. We agree.

Article 37.07, Section 3(a)(1) of the Texas Code of Criminal Procedure states in relevant part:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PRO. art. 37.07, § 3a(1). Darosa did not argue in the lower court that evidence of the extraneous offenses was inadmissible under Article 37.07. Instead, he argued that admission of the evidence would be highly prejudicial.

39

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling he desires the court to make if the specific grounds are not apparent from the context. TEX. R. APP. P. 33.1(a)(1)(A). "[A] trial court's decision will not be reversed on a theory the trial court did not have an opportunity to rule upon and upon which the non-appealing party did not have an opportunity to develop a complete factual record." *Hailey v. State*, 87 S.W.3d 118, 122 (Tex. Crim. App. 2002); *Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003) (holding appellant did not preserve error when objection at trial did not "comport with the complaint raised on appeal"); *State v. Mercado*, 972 S.W.2d 75, 77 (Tex. Crim. App. 1998) ("[W]e have not afforded the courts of appeals latitude to reverse a trial court's decision on new theories of law not previously presented to that court for its consideration."); *see also Chambers v. State*, No. 01–10–00317–CR, 2011 WL 2652252, at *1–2 (Tex. App.—Houston [1st Dist.] July 7, 2011, pet. ref'd) (mem. op., not designated for publication) (holding that Rule 403 objection in trial court did not preserve error with respect to complaint that State failed to prove extraneous offense beyond reasonable doubt as required by Article 37.07, section 3(a)(1)); *Kucel v. State*, No. 11-97-071-CR, 1998 WL 34193983, at *1 (Tex. App.—Eastland June 4, 1998, no pet.) (not designated for publication) (same).

Because Darosa did not object to the admission of the challenged evidence under Article 37.07, he did not give the trial court the opportunity to consider the inadmissibility of the evidence under that article. He thus failed to preserve the issue for our review. *See Guevara*, 97 S.W.3d at 583 (holding appellant "failed to preserve any error" regarding admission of testimony "because the objection at trial [did] not comport with the complaint raised on appeal").

We overrule Darosa's second issue.

## C. Modification of Judgment

Although neither party has requested that we do so, we *sua sponte* modify the trial court's written judgment in Cause No. 96046-CR to make sure it conforms with the jury's verdict. *See Williams v. State*, No. 01-19-00783-CR, 2022 WL 774247, at *6 (Tex. App.—Houston [1st Dist.] Mar. 15, 2022, no pet.) (mem. op., not designated for publication) ("Although neither party has requested that we modify the trial court's judgments, we may, sua sponte, reform a clerical error in a trial court's judgment to ensure that it reflects the jury's verdict."); *St. Julian v. State*, 132 S.W.3d 512, 517 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (modifying judgment *sua sponte* to correct clerical error in judgment that contradicted jury's verdict). "An appellate court may correct and reform a trial court judgment to make the judgment congruent with the record." *Id.* (citing *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.–Houston [1st Dist.] 2001, no pet.)). This

Court has the authority "to modify an incorrect judgment when we have the necessary data and information to do so." *Harris v. State*, No. 01-10-00319-CR, 2011 WL 2089684, at *5 (Tex. App.—Houston [1st Dist.] May 19, 2011, pet. ref'd) (mem. op., not designated for publication) (citing TEX. R. APP. P. 43.2(b)).

The jury found Darosa guilty of the offense of aggravated robbery in Cause No. 96046-CR. The jury charge stated, "Our law provides that a person commits the offense of Aggravated Robbery if he commits robbery and uses or exhibits a deadly weapon." "Deadly weapon" is defined in the jury charge as "a firearm." The charge continues:

> Now if you find from the evidence beyond a reasonable doubt that in Brazoria County, Texas, on or about the 5th day of July, 2022, the defendant, VICTOR DERICK DAROSA, II, did then and there, acting alone or as a party . . . while in the course of committing theft of property owned by Blanca Escobedo, and with intent to obtain or maintain control of said property, intentionally or knowingly threaten or place Blanca Escobedo in fear of imminent bodily injury or death, and said defendant did use or exhibit a deadly weapon, namely, a firearm, then you will find the defendant guilty of the offense of Aggravated Robbery as alleged in the indictment.

Although the jury convicted Darosa of aggravated robbery, the judgment contains a "N/A" indication with respect to a deadly weapon finding. The "N/A" indication is incongruent with the jury's verdict, which included an implicit finding that Darosa used or exhibited a deadly weapon in commission of the robbery.

We thus reform the judgment of the trial court in Cause No. 96046-CR to reflect the jury's finding that Darosa used or exhibited a deadly weapon in

commission of the robbery. *See* TEX. R. APP. P. 43.2(b) (stating court of appeals may "modify the trial court's judgment and affirm it as modified"); *Marrugo v. State*, No. 01-22-00362-CR, 2023 WL 6299120, at \*10 (Tex. App.—Houston [1st Dist.] Sept. 28, 2023, no pet.) (mem. op., not designated for publication) (reforming judgment *sua sponte* to reflect jury's findings on enhancement paragraphs).

## Conclusion

We affirm the trial court's judgment in Cause No. 96045-CR, and we affirm the trial court's judgment in Cause No. 96046-CR as modified.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).